HOBART M. STOCKING v. BLANCHE C. STOCKING.

May 19, 1899.

Nos. 11,507—(76).

**Divorce—Wilful Desertion.**

To entitle a plaintiff to a divorce on the ground of desertion, he must allege and prove wilful desertion by the defendant for a full year next before the commencement of the action.

**Same—Misconduct Justifying Desertion.**

The misconduct of one of the parties to the marriage contract, which will so far justify the injured party in leaving that the separation will not constitute wilful desertion, need not necessarily be such as to entitle the injured party to a divorce. It is sufficient if the party withdrawing from the cohabitation has reasonable grounds for believing, and does honestly believe, that by reason of the actual misconduct of the other it cannot be longer continued with health, safety, or self-respect. Wilful desertion in such a case does not begin until after the offending party has in good faith exhausted all reasonable efforts to right the wrong, and to satisfy the injured spouse that there will be no recurrence of the causes which induced the separation, nor until the lapse of a reasonable time for a consideration of the overtures for a reconciliation.

**Same—Finding not Sustained by Evidence.**

Rule applied, and *held*, that the finding of the trial court in this case, to the effect that the defendant wilfully deserted the plaintiff one year next before the commencement of this action, is not sustained by the evidence.

Action in the district court for Ramsey county for divorce. The case was tried before O. B. Lewis, J., who found in favor of plaintiff; and from an order denying a motion for a new trial, defendant appealed. Reversed.

*Ambrose Tighe* and *Charles W. Farnham*, for appellant.

*Stevens, O'Brien, Cole & Albrecht*, for respondent.

START, C. J.

The complaint herein alleges that the parties are husband and wife, and that prior to January 16, 1897, the defendant, without cause or justification therefor, wilfully deserted the plaintiff, and

ever since that time has, and still does, wilfully desert him, and prays that the marriage between the parties may be absolutely dissolved. The answer denies that the defendant ever wilfully, or without cause or justification, deserted the plaintiff, and affirmatively alleges that the plaintiff, by his misconduct towards her, and his cruel and inhuman treatment of her, drove her from him; wherefore she prays for an absolute divorce. The trial court found that on January 15, 1897, and for more than one year next preceding the filing of the complaint herein, the defendant wilfully, and without any cause or justification, deserted the plaintiff, and that all of the allegations of the complaint are true, and that the allegations of the answer are not true. The defendant appealed from an order denying her motion for a new trial.

The defendant assigns as error, with others, that the finding of the trial court that the defendant, on January 15, 1897, and for more than one year preceding the filing of the complaint, without any cause or justification therefor, wilfully deserted the plaintiff, is not justified by the evidence. It is necessary, before this assignment of error can be intelligently considered, to determine what constitutes "wilful desertion," as the term is used in the statute (Laws 1895, c. 40), and for what length of time it must have continued next before the commencement of an action for a divorce on that ground. The statute provides that a divorce may be had for

"Wilful desertion of one party by the other for the term of one year next preceding the filing of the complaint."

If the words "next preceding the filing of the complaint" are to be given their literal meaning, and it is not necessary to file the complaint until on or before the first day of the term of court for which the action is noticed for trial, it would follow that a party could commence and maintain an action for a divorce on the ground of desertion three months, more or less, before the statutory period had expired, by withholding the complaint from the files for that length of time, and proving desertion for one year next before such filing. Manifestly, such is not the meaning of the statute, which assumes that the complaint will be filed at the time the action is commenced; for the proposition is unthinkable that an action for

divorce may be commenced before there is any cause of action, and before it can be possibly known that there ever will be one. Our construction of this statute is that a party, in order to entitle himself to a divorce on the ground of desertion, must allege and prove wilful desertion by the defendant for one full year next before the commencement of the action. The complaint in this case was verified, and the summons issued, on January 17, 1898, and they were served on the defendant eight days thereafter. This action, then, was commenced not later than January 25, 1898, and the plaintiff, to maintain it, was bound to prove that the defendant wilfully deserted him on or before January 25, 1897.

To constitute wilful desertion, within the meaning of the statute, the going away and refusing to return by the accused party must be without justifiable cause therefor. Counsel for the plaintiff, however, claim that no misconduct of one party to the other will justify a breaking off of cohabitation, and prevent it being wilful desertion, except ill conduct of a kind and degree which would legally entitle the party to a divorce. "So," they say, "the question narrows down to whether the evidence in this case required a finding that the defendant was entitled to a divorce upon the ground of cruel and inhuman treatment." If the law be as claimed by counsel, their conclusion is logical.

Whether the misconduct of one of the parties to a marriage, which will justify the other in leaving, must be such conduct as could be made the foundation of a judicial proceeding for a divorce, is a question upon which there is not unanimity of authority. Mr. Bishop maintains that, on principle, the misconduct must be such as to entitle the injured party to a divorce. 1 Bishop, Mar. & Div. §§ 795-799. The basis of his opinion, briefly stated, is that it is the general policy of the law to keep the parties as much as possible together, and that their separation is not to be tolerated for light causes, and that all causes are light which the law does not recognize as ground for the dissolution of the marriage. We agree with the learned author as to the policy of the law. Its policy ought to be to discourage lax views as to the dissolution of the marriage contract. But it seems to us that any rule which will permit the husband to enter upon a course of conduct towards his wife which

is humiliating, insulting, and degrading, and thereby drive her from him (unless she be a stolid and spiritless animal, with no wants or aspirations above physical comfort), and at the expiration of a year come into court and claim a divorce on the ground of her wilful desertion, if his misconduct does not legally entitle her to one, tends directly to the degradation of womanhood, and enables him to take advantage of his own wrong. Such a rule or doctrine undermines the sacredness of the marriage tie, facilitates its dissolution, and defeats the wise policy of the law upon which the rule is supposed to be based.

On principle, and what seems to be the weight of authority, we hold that the misconduct of one of the parties to the contract of marriage, which will so far justify the injured party in leaving that the separation will not constitute wilful desertion, need not necessarily be such as to entitle the injured party to a divorce. It is sufficient if the party withdrawing from the cohabitation has reasonable grounds for believing, and does honestly believe, that, by reason of the actual misconduct of the other, it cannot be longer continued with health, safety, or self-respect. Wilful desertion, in such a case, does not begin until after the offending party has in good faith exhausted all reasonable efforts to right the wrong, and to satisfy the injured spouse that there will be no recurrence of the causes which induced the separation, nor until after the lapse of a reasonable time for a consideration of the overtures for a reconciliation. 9 Am. & Eng. Enc. 777; Hardin v. Hardin, 17 Ala. 250; Lyster v. Lyster, 111 Mass. 327; Bradley v. Bradley, 160 Mass. 258, 35 N. E. 482; Thorpe v. Thorpe, 9 R. I. 57; Cornish v. Cornish, 23 N. J. Eq. 208; Gillinwaters v. Gillinwaters, 28 Mo. 60. If the rule we have indicated be enforced, there will be fewer divorces on the ground of desertion, and more husbands and wives abiding together.

The question for our decision is, then, not whether the evidence was such as to require a finding that the plaintiff was guilty of such misconduct towards the defendant as would entitle her to a divorce upon the ground of cruel and inhuman treatment; but the question is, does the evidence, when tested by the rule we have stated, justify the trial court's finding that the defendant wilfully deserted the

plaintiff one year next before the commencement of this action? The details of the married life of the parties, and the causes which led to their separation, are neither inviting nor inspiring, and we shall refer to the evidence only so far as seems to be necessary to indicate the basis of our conclusion that the finding is not sustained by the evidence. The answer, in addition to the allegations as to the general misconduct of the plaintiff towards the defendant, specifically charges that the plaintiff, at the time of the marriage of the parties, had a loathsome, secret, and infectious disease, which was known to him, and that he infected her with it. The evidence shows that his general treatment of the defendant was at times kind and considerate, but at other times it was decidedly the reverse. This is especially evident from his letters to her. The correspondence between the parties, and so much of the evidence as is practically undisputed, tend to establish beyond reasonable controversy the following facts:

The parties were married April 22, 1896. He was a widower about 50 years old. She was then a girl of 21 years, physically and morally healthy. Three weeks before marriage his physical condition, as testified to by his physician (and necessarily known to the plaintiff), was this: "He was having an inflammation of the mucous membrane of the mouth, in which the membrane was thoroughly inflamed and congested. There were patches (that is, I mean, ulcers) on the inside of the mouth, in several places, indurated edges, elevated above the margin of the mucous membrane. Some of them were covered with a grayish adherent matter, accompanied with a good deal of irritation and discomfort to him. And he had a tooth on one side (I think on the right side) of his face that was loose and painful. The gum was sore and inflamed, and I tried to have him have it out and disposed of. He objected to that. He had what we understand to be aphthous stomatitis. There were other symptoms accompanying this. He was feverish; he had a little temperature; the tongue was coated, and with dark-colored fur on the tongue; an increased amount of saliva (was spitting constantly), and didn't look well and didn't feel well."

One month after the marriage her physical condition, as testified to by her physician, whom she consulted at Chicago, was this:

"The left side of her mouth, the gums of the lower jaw and the upper jaw, and the inside of the left cheek, extending as far back as the pillars of the tonsils, were red and inflamed, and there were a number of ulcers, as large as a pea or a bean, presenting a hardened, clear-cut border, on a dark, congested mucous membrane. The mucous membrane had a dark, venous, congested appearance. Q. How many of these hardened ulcers were there? A. There were two or three that were very clearly defined, and others that were not so well defined. Q. What was the disease, doctor, which was manifested by these ulcers? A. I diagnosed it a specific infection; syphilitic, was my diagnosis." Her physician did not disclose the character of the disease, but gave her a prescription containing mercury, which she used, and her health improved while the medicine lasted. On July 17, 1896, her condition, as testified to by her physician at St. Paul, was this: "Her mouth presented a swollen, congested appearance,—the gums. The membranes of the mouth were also dark in color, suggesting considerable past trouble, with numerous white or grayish patches, scattered throughout the cavity of the mouth, including the lips and the cheeks. These patches varied in size from very small to possibly the size of a dime, or close to that size. The gums were blue,—not receding from the teeth, however." He further testified to the effect that at the time he formed the opinion that the defendant's condition was due to syphilis in some of its forms, but that he did not diagnose the case as syphilis; that is, as he explained it, unalterably so decide. He also prescribed mercury, but did not tell her what was the matter.

The parties were living in the city of St. Paul at this time, and about December 1, 1896, the defendant proposed to go to Fort Thomas, Kentucky, to spend Christmas with a married sister at the army post there. The plaintiff at first opposed her going, but finally consented. When she left to make this visit to her sister, it was with the intention of returning to her husband. Her health was still imperfect, and about December 23 she was informed by her sister to the effect that she and her husband had consulted with the family physician, and that the disease from which the defendant had been suffering was syphilitic in its character. She then called upon the physician herself, who, while he did not tell her

distinctly that she was suffering from syphilitic poison, conveyed that meaning to her, as she claims; but she is not corroborated by the physician on this point. Thereupon she at once wrote to the plaintiff, in effect, that a reliable physician said that the trouble with the plaintiff's teeth and gums, and his other trouble, were caused by powerful medicines he had taken to cure a horrible disease brought on by fast living, and added: "That is all. Now you know what has rankled in my brain. It is loathsome enough, but it is better to face it now than later."

On the receipt of this letter, and on December 25, the plaintiff wrote and mailed two letters to the defendant. He then took the train for Cincinnati, arriving there in advance of his letters. His wife met him, and they went to a hotel. He assured her that he had never been diseased as claimed, and that he would submit himself to a physical examination, so that she might be satisfied of the truth of his statement. He also stated to her that he had written her two terrible letters in his anger, which he requested her to burn without reading. As a result of the interview it was agreed that he should go to St. Paul, arrange his business, and return, and together they would go south for the winter. He left for St. Paul about the last of December, 1896, and returned to Cincinnati January 16, 1897. During this interval the parties interchanged letters which indicated that both parties intended to carry out the arrangement for the trip south. Meanwhile the defendant read a good deal on the subject suggested by her letter of December 23, but received no advice from a physician. Her doubts and fears seemed to have been revived. When in this state of mind, and about January 14, she read for the first time the two letters written by him on December 25. The first one, so far as here material, is this:

"How can I wait for vindication? I demand the name of the physician at once. Who gave you this information? I will go before any physician on earth, and you may, or I will summon any physician who treated me. This shall certainly go into court, and, if you refuse to divulge the name of the physician, I shall sue you for slander. God knows how I loved you! God knows how I hate and despise you! * * * Oh how vile you are! Beneath the contempt of any honest man, or any honest thinking man! Have you

a grievance? Great God, how you can live, and breathe, and have such a foul heart, is beneath my comprehension."

The second letter contained, with others, these statements:

"Did I not tell you that I always wanted to go with you when you went to see a doctor? Did you not refuse me this privilege? It seems you have confidential relations with your doctor, which not only precluded my presence, but kept me in ignorance of the slander and intrigue destined so soon to wreck my home, and you were a party to it, deliberate and cold-blooded. What have been your habits, that you seek to put this blot upon my name? Have you a memory? Do you wish me to make charges or revelations? You certainly stand on no ground to throw mud. My trouble was contracted in the army, doing what little I could to save my country's flag. It is called the 'scurvy.' * * * Give me the doctor's name at once. He shall retract, or I will kill him."

On the day next after she read these letters, her mother, with her consent, wired the plaintiff to the effect that none of her family were willing that she should go south with him, and that she knew the message was sent. The defendant, on January 15 or 16, received a telegram from her husband that he was on his way to meet her. She then wrote a letter to him, and left it at the hotel where he intended to stop. This letter announced her decision not to return to him, and concluded with these words: "I hoped against hope, but the impossibility of it all has come to me in the last few days with such force that I dare not go. I know I should be ill again. I never felt well after the first month of our marriage, except during this visit. I have been taking medicine, and am once more gaining my old strength. You ask me not to come back to you unless to stay. You told me, if I felt I would be happier in my old life, I could return. I did love you, Hobart, when I married you, and the recollection of that love will always be sweet. I would do anything now to help you, except to live with you. I can never again return to the utter desolation of the life I have left. You and yours have always my best wishes, and I do believe you will be happier with some one [else] who can be happy with you than with some one like me, who must always, when with you, be 'as a stranger in a strange land.'"

After leaving this letter at the hotel, she went to her grandmoth-

er, who was living at Cleveland, Ohio. The plaintiff was ignorant of her whereabouts, and was unable to secure a personal interview with her. The parties, however, afterwards exchanged letters, each of them sending letters to her family to be remailed to the other. The plaintiff, in his letters, urged her to return to him; but he did not submit for her consideration any certificate, or statement of the result of any physical examination, showing that he was not afflicted with any contagious disease. There is no evidence that he submitted himself to the promised physical examination prior to August or September, 1897. In the last-named month he was physically examined by two physicians, one of whom made a certificate to the effect that he was free from any evidence of any venereal or infectious disease whatsoever. The other made a certificate to the effect that his examination did not disclose any evidences of syphilis. These certificates were presented to the defendant about September 21, 1897, by the plaintiff, at a personal interview with her. He then told her that, if they were not satisfactory, she might name any physician she pleased, and he would go with her father, and submit himself unconditionally to an examination. He urged her in this interview to return to him, but she refused so to do. The plaintiff, on the trial, gave in evidence the testimony of eminent experts, who examined him in September, 1897, to the effect that they found no evidence of syphilis, and some of them gave an opinion to the effect that they would have discovered traces of it if he had been so afflicted in April or May, 1896, and, further, that the condition of the defendant's mouth, as described by her physicians, did not indicate syphilis.

The question for our decision is, as we have suggested, not whether the plaintiff was in fact afflicted with syphilis, or whether the defendant ought to have returned to her husband after the interview in September, 1897, or whether his treatment of her entitles her to a divorce; but the question is whether the evidence justifies a finding that she wilfully deserted him on January 16, 1897, or at any time prior to the 25th of that month. Or, in other words, did she at that time have reasonable cause for believing that by reason of his misconduct she could not then return to him in safety and with self-respect.

The question must be answered from a consideration of the facts as they appeared to her at that time.   We are of the opinion that the evidence is practically conclusive that she did not wilfully and without cause desert her husband one year before the commencement of this action.   His letters of December 25, which she first read shortly before she decided not to return to him, were of a character calculated to increase her doubts and fears, instead of allaying them.   They contained charges and insinuations against her purity which no self-respecting wife could condone until a sincere and manly retraction and apology were tendered.   He did not, in January, 1897, whatever he may have done in September following, exhaust all reasonable efforts to induce his wife to return to him. It was his manifest duty, under the circumstances, promptly to submit himself to a physical examination and communicate to her the result, and allow a reasonable time for her to decide the question of accepting his overtures for a reconciliation.   This he did not do until less than five months next before he commenced this action.

The finding of the trial court in question is not sustained by the evidence, and a new trial must be granted.   Whether the evidence sustains the finding of the trial court to the effect that the plaintiff was not guilty of cruel and inhuman treatment of the defendant we do not decide.   The issues made by the pleadings and the evidence are so interdependent that it is impracticable to separate them.   For this reason, we are of the opinion that substantial justice requires that, inasmuch as there must be a new trial as to the issues tendered by the complaint, it should extend to all of the issues in the case.

Order appealed from reversed, and a new trial granted as to all of the issues.

The following order was filed on June 26, 1899:

PER CURIAM.

A motion herein to modify the order heretofore made, remanding this case, having been duly heard and considered on an order to show cause, it is ordered that such order be amended so as to read as follows:

Ordered, that the order appealed from be, and it is hereby, re-

versed, and a new trial granted absolutely as to the plaintiff's action, and, as to the defendant's cross action, upon the condition that if the plaintiff shall, within 30 days after the filing of the remittitur in the court below, elect to dismiss his action without prejudice, and bring another action, and so notifies the defendant's attorneys within such time, she consents that her cross action may also be dismissed without prejudice. If she does not accept this condition, then the order appealed from to stand affirmed as to her cause of action.