CATINCHI, PLAINTIFF AND APPELLEE, *v.* CATINCHI, DEFENDANT AND APPELLANT.

APPEAL from the District Court of Mayagüez in an Action for Divorce.

No. 1942.—Decided May 29, 1919.

DIVORCE—ABANDONMENT—SUPPORT.—The fact that a husband has performed his civil duty to his wife and provided for her does not prevent her seeking a divorce for abandonment. The failure to provide, however, is one of the circumstances that tend to show a desertion.

ID.—ID.—INTENT.—The statute makes abandonment for more than one year a ground of divorce and while there must be a coexistent intention to abandon, such intention may generally be inferred from the abandonment.

ID.—ID.—RECONCILIATION.—Any effort at reconciliation on the part of the innocent husband or wife is frequently rendered unnecessary, except when the intention to abandon is not certain. Generally, the courts put no great duty on the part of an innocent wife to seek a reconciliation when abandoned by her husband. The duty of the husband to seek a reconciliation is much more positive, inasmuch as he is always the one on whom the initiative in maintaining a home depends. When the husband has abandoned his wife without a real cause, if he wishes to prevent the running of the statute his duty is clear to attempt to effect a genuine reconciliation before the termination of the period. Such an offer must be sincere and without such conditions that no self-respecting woman, not in the wrong, could be expected to accept. Sending a letter to a sister of the wife is not an offer to resume the marital life.

The facts are stated in the opinion.

*Messrs. A. Nazario Lugo* and *Pascasio Fajardo* for the appellee.

*Mr. Andrés Mena* for the appellant.

MR. JUSTICE WOLF delivered the opinion of the court.

Pedro P. Catinchi is a photographer who settled in Mayagüez where he married the complainant María Vázquez. While living there he made, for the purposes of his business, several trips of long duration to different parts of the Island or to Santo Domingo, during which time the complainant took up her residence with her parents. One of these trips lasted six months. The couple have one child, Cuba, who was about seven years old when the trial was held. There is some evidence tending to show that at the time of the desertion complained of in this case, the complainant knew that her husband was about to make one of his periodical trips, but that she was not expected to go to the house of her parents is shown by the curious complaint of her husband in his testimony that she gave up her house and went to the home of her parents without his knowledge and consent. On the 2nd of August, 1916, or the day before, the couple had a quarrel of words, testified to by several witnesses, the nature of which is not disclosed, but there is no intimation in the record, except in a letter of the husband, that the wife was at all at fault and especially not a fault of a nature to justify a desertion. The husband says he was mildly angry with his wife.

On the 2nd of August, 1916, without saying good-bye to the complainant, he left her and with the exception of the letter written July 31st, 1917, he made no effort to communicate with her nor to request her to follow him. Several little presents he sent to his daughter, amounting to about $12, and the latter wrote to him. He also, shortly after August 2, 1916, sent $64 to the cook, but it appears that this amount was to cover bills and her wages contracted prior to that date. With the exception of these irrelevant matters he made absolutely no contribution to his wife's support after August 2nd, 1916. In his testimony he attempts to extenuate this neglect by saying that he left her her jewels

and the household furniture, and apparently he expected her to pawn these things if necessary.

On the 2nd of August, 1916, he was accompanied to the station by a brother of the wife and told him that he was leaving never to return, a statement which the defendant himself confirmed on the witness stand, and the indications of the evidence are fairly clear that this statement was communicated to the wife, as she testified to this conversation with her brother. It is a fair inference from the testimony ᵔf the husband and otherwise that he made his intention known to his wife on the 2nd of August, 1916, if not before. About the end of the month she gave up her house and went to live with her parents.

During the separation the father of the complainant, in an effort to effect a reconciliation, saw the defendant in Caguas. The date is not mentioned, but the witness testified that the relations of the parties had not changed. In this conversation Catinchi told Vázquez that a reconciliation was impossible; that he was not disposed to live with the daughter of Vázquez again; that if she came to Catinchi's house he would receive her, but she would have to live in his house completely apart from him with such support as he could give her; that he would not cohabit with her, that he would be ashamed to go on the streets with her and that she should live without going out on the street (sic); that he regretted the matter but nothing else was possible, and that his sole concern was to have his daughter with him and to direct her education. The witness stated his belief that under these circumstances a reconciliation was impossible.

Shortly before the expiration of the year the wife was taken ill, went to the hospital and had a serious operation for appendicitis. Her illness was communicated to the husband, but he took no further notice of it than is disclosed in the letter of July 31st, 1917.

This letter was sent, not directly to the wife, but to a sister of the complainant. It follows:

"Caguas, July 31, 1917.—Mrs. María Vázquez de Catinchi, Maya-güez, P. R.—After having thought about it a long time, I have decided to ask you to come to my house (which is yours) where we shall live in accordance with my financial position which is not very satisfactory; and on condition that the disagreeable scenes are not repeated which have upset the peace that ought to prevail in every home.

"I need make no great effort to make you understand that my sole wish is to have Cuba with me and to direct her education. I know that you are ill and cannot answer immediately, but I hope that you will answer me as soon as your state of health allows in order that I may find a more confortable house, seeing that the one I have only has one room in which Luis and I sleep at close quarters. Pepe."

This letter was received by the wife only on the 8th or 9th of August, 1917. She replied as follows:

"Mr. Pedro Catinchi, Caguas, P. R.—Not until today did my state of health permit me to answer your letter which has made me meditate and think a great deal, having reached the conclusion that your proposition is not agreeable for you, nor for me, nor for the child. I believe that the project of divorce, which you always desired, is the most practical thing that we can do.

"I hope that you will answer me agreeing that I may present my complaint at the end of the current month. María."

The foregoing is the undisputed evidence at the trial. In addition the wife gave testimony tending to show that in the early days of the separation she wrote to her husband requesting him to return, duly directing the letters, with return address, and that the letters were not returned. Although the husband denied the receipt of these letters the judge below in his opinion believed her story and this would be the presumption, if necessary, from the judgment in her favor. There are little matters that tend to corroborate her, like the unconciliatory attitude of the husband when visited by the father of the complainant. Likewise in his testimony he tells of a return of a pair of shoes that he sent to his daughter which his wife returned. In any event he also knew

and made a naive complaint of her having left the house, a fact communicated to him. It would seem that as communications that would tend to put his wife in the wrong could reach him, so could her letters. This was substantially all the proof and we see nothing in it to give color to the "ardent affection" for his wife of which the answer speaks. The court found in favor of the complainant.

We need not unduly stress the failure of the husband to support his wife. The fact that a husband had performed his civil duty to her and provided for her does not prevent her seeking a divorce for abandonment. 4 R. C. L. 367. The failure to provide, however, is one of the circumstances that tends to show a desertion.

The statute makes abandonment for more than one year a ground of divorce and while there must be a co-existent intention to abandon, such intention may generally be inferred from the abandonment.

Without further analysis of the proof it was clear that up to July 31st, 1917, the date of the letter from the husband, all the elements for a divorce existed. The case is readily distinguished from *Girot* v. *Crispín*, 23 P. R. R. 764, inasmuch as the intention here to abandon was manifest at the moment of abandonment.

Under a statute like our own, where an abandonment and intention to abandon appear, any effort at reconciliation on the part of the innocent husband or wife is frequently rendered unnecessary. *Lanier* v. *Lanier,* 5 Heisk, 62; *Patterson* v. *Patterson,* 83 Pac. 196. An effort at reconciliation then is only necessary when such intention is not certain, as when there was a spirit of acquiescence on the part of the innocent person. *Hitchcock* v. *Hitchcock,* 15 App. D. C. 93.

Generally, too, the courts put no great duty on the part of an innocent wife to seek a reconciliation when abandoned by her husband. *Wilson* v. *Wilson,* 57 A. 562; *Coe* v. *Coe,* 59 A. 1059; *Fielding* v. *Fielding,* 64 So. 546. 9 R. C. L. 371, 372.

The duty of the husband is much more positive, inasmuch as he is always the one on whom the initiative in maintaining a home depends. *Wood* v. *Wood,* 53 A. 51; *Hill* v. *Hill,* 39 L. R. A. (N. S.) 117 and notes; 14 Cyc. 617. And this duty is so imperative and continuous that it takes a very strong case to relieve him of the necessity of effecting a reconciliation. The mere fact that a wife left the husband's house in a fit of anger would not generally and alone give the husband a ground for divorce. In this case, moreover, although we do not principally base our decision thereon, the proof tends to show efforts at reconciliation on the part of the wife and the efforts of her father may perhaps be imputed to her.

When, however, the husband has abandoned the wife without a real cause, if he wishes to prevent the running of the statute his duty is clear. to attempt to effect a genuine reconciliation before the termination of the period. *Benkert* v. *Benkert,* 32 Cal. 467; *Bovaird* v. *Bovaird,* 78 Kan. 315, 96 Pac. 666; *Creasey* v. *Creasey,* 168 Mo. App. 68; *Stocking* v. *Stocking,* 76 Minn. 292, 79 N. W. 172, 668.

Such an offer must be sincere and without such conditions as no self-respecting woman, not in the wrong, could be expected to accept. *Gordon* v. *Gordon,* (Pa.), 57 A. 525; *Andrade* v. *Andrade,* 128 P. 817. *Maloney* v. *Maloney,* 145 Pac. 631; 9 R. C. L. 373; 14 Cyc. 619. See also *Woolard* v. *Woolard,* 18 App. D. C. 326, where the wife was perhaps originally in the wrong.

It must likewise be an offer to resume the marital life. Some of the above authorities show this and likewise *Fraser* v. *Fraser,* L. R. A. 1917 E. 738.

Under the facts before us, and terribly at fault as the husband was from the standpoint of the law, it was his duty to see that the offer of reconciliation was communicated to the wife within the statutory period. Instead, the letter reached her on the 8th or 9th of August, 1917. The abandonment took place on August 2nd, 1916. The letter was

written on July 31st, 1917, and reached the sister on August 2nd, 1917, dubiously within the year. The receipt by the sister was not the receipt by the wife. The defendant should have seen to it that the offer of reconciliation reached the wife herself. We feel bound to hold that there was no interruption of the period by the mere writing of the letter nor its receipt by the sister.

We need not, however, base this opinion on the ground alone that the letter came too late. The letter fulfilled neither the condition of sincerity required by the law nor was it a genuine offer to resume the marital life. Given the previous conversation with the father, it was not a clear offer to resume cohabitation with the wife. The emphasis was laid on the daughter even if the letter be taken alone.

In its terms, too, it purported to exact a promise that the wife should not repeat the scenes which, in the mind of the husband, had caused the abandonment. While maintaining in his defense that he did not favorably receive the good offices of the father because he was still incensed with his wife, he apparently admits that he did not consider the quarrel a serious one. We must not be understood as holding or maintaining that a letter need be scrupulously correct or absolutely devoid of reproach, but an element of sincerity must run through it and it must not be couched in a manner almost certain to produce hostility. The careful avoidance from saying even "Dear María" may be noted as well as the similar lack of even a polite conclusion. The letter involved a promise by the wife that disagreeable scenes should not be repeated, if not an acknowledgment that the abandonment was caused by her. There is nothing in the theory that the offer to find a house tended to show sincerity. The letter, too, is anything but considerate of the wife, sick in bed. Besides the fling involved in the reference to the daughter, there is no offer to come for his wife or to provide for her transportation to Caguas. An offer, too, to send her anything for

her support after 364 days of failure to provide was signally absent from the letter.

The judgment must be

*Affirmed.*

Chief Justice Hernández and Justices del Toro, Aldrey and Hutchison concurred.